## Case No. 13,756.

### TARR et al. v. FOLSOM.

[1 Ban. & A. 24; 1 Holmes, 312; 5 O. G. 92.] [1]

Circuit Court, D. Massachusetts. Jan. 1, 1874.

PATENTS—REISSUE—IDENTITY—DEPOSIT IN PATENT OFFICE—PAINT FOR SHIPS' BOTTOMS.

1. The original patent for paints for ships' bottoms, describes the paint as compounded of a vehicle, and oxide of copper finely pulverized. In another part of the specification, the patentees describe the oxide of copper to be used, as "copper ore in the form of an oxide," and say: "We prefer to employ the pyritous friable ores, which are easily reduced to a fine powder." In a reissue of the patent, it is stated that the pyritous friable ores contain mineral and earthy substances, such as various other metallic oxides, sulphur, etc., which serve to divide the particles of oxide of copper, interposing between them substances which dissolve more slowly than they do, or which do not dissolve at all. The patentees say in the reissue: "We prefer to employ the oxide of copper, made from pyritous friable ores," that is, the oxide of copper made by roasting the pyritous ores exposed to air and heat, and thus converting the copper, which they contain, into oxide. It is proved that the oxide of copper, thus manufactured, was well known in the arts prior to the patent: Held, that the reissued patent is not for an invention different from the one substantially described in the original specification.

[Followed in Wonson v. Peterson, Case No. 17,934.]

2. A failure to deposit in the patent office, a sample of one of the ingredients of a composition of matter, does not invalidate a patent for such composition, when the specification describes all the ingredients.

3. It is for the commissioner to decide, before the granting of the patent, whether the deposit of the ingredients of a composition has been made, and after the patent is granted for such composition, it cannot be impeached on the ground that such deposit has not been made.

[Cited in brief in Fassett v. Ewart Manuf'g Co., 58 Fed. 364.]

4. A paint for ships' bottoms, composed of oxide of copper, yielding in seawater a poisonous solution, with a suitable vehicle or medium and a base of earthy or mineral matter, is not an equivalent to a paint composed of a combination of oxide of copper, an alloy of antimony, and copper with the same vehicle; the three elements operating together to produce the poisonous action.

[Cited in Wonson v. Gilman, Case No. 17,933.]

5. The omission of one of the ingredients of a composition, before supposed to be essential, is a patentable subject, under certain circumstances.

6. A paint for ships' bottoms, composed of a combination of oxide of copper, yielding in seawater a poisonous solution, with a suitable vehicle or medium, and a base of earthy or mineral matter, which serves to divide the particles of oxide of copper, interposing between them substances which dissolve more slowly than they do, or which do not dissolve at all, is infringed by the use of a paint composed of the same vehicle, oxide of copper, and Brandon red, which is an oxide of iron associated with more or less of

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and by Jabez S. Holmes, Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 1 Ban. & A. 24, and the statement is from 1 Holmes, 312.]

earthy matter, which, by its imperfect solution in seawater, retards the solution of the oxide of copper.

[Cited in Wonson v. Gilman, Case No. 17,933.]

[Bill in equity [by James G. Tarr and others against Charles E. Folsom] to restrain alleged infringement of reissued letters-patent [Nos. 4,598 and 4,599] for a paint for ships' bottoms, granted James G. Tarr and A. H. Wonson, Oct. 17, 1871. The original patent was granted Nov. 3, 1863 [No. 40,515].[2]

Causten Browne and Jabez S. Holmes, for complainants.

T. W. Clarke, for defendant.

SHEPLEY, Circuit Judge. This is a bill in equity for an alleged infringement of letters-patent granted to complainants on the third day of November, 1863, and reissued on the seventeenth day of October, 1871, in two divisions, for an improved paint for ships' bottoms, or marine paint. The answer sets up in defence that the patent was surreptitiously obtained by the complainants for what was the invention of one Owen Jones; but no evidence was introduced to sustain this defence. The answer also sets up that the specifications in the reissue describe substantially different inventions from any described and shown in the original patent, or in the specification thereof, or in the samples filed in the patent office in illustration thereof.

The original patent describes the paint as compounded of a vehicle consisting of tar and naphtha mixed together, and oxide of copper finely pulverized, in the described proportions. In another part of the specification the patentees describe the oxide of copper to be used as "copper ore in the form of an oxide." The specification also says, "we prefer to employ the pyritous friable ores, which are easily reduced to a fine powder."

In division B of the reissue the patentees state that the pyritous friable ores contain mineral and earthy substances, such as various other metallic oxides, sulphur, &c., which serve to divide the particles of oxide of copper, interposing between them substances which dissolve more slowly than they do, or which do not dissolve at all. They say in the reissue, division B: "We prefer to employ the oxide of copper made from pyritous friable ores;" that is, the oxide of copper made by roasting the pyritous ores exposed to air and heat, and thus converting the copper which they contain into oxide. The description in the original patent of "copper ore in the form of an oxide," taken in connection with "the pyritous friable ores" subsequently referred to, substantially suggests, if it does not accurately describe, the oxide of copper made by roasting the pyritous friable ores described in the reissue, especially when we take into account the fact that ox-

[2] [From 1 Holmes, 312.]

ide of copper thus manufactured is proved to have been well known in the arts and manufactured in large quantities prior to 1863, and therefore the description was sufficiently intelligible to those to whom it was addressed. It cannot, therefore, with justice, be said that the reissued patent is on its face for an invention different from the one substantially—though not in exact and precise language—described in the original specification.

Evidence also is introduced tending to show that the sample deposited in the patent office was not such an oxide of copper combined with an earthy matter or base as is described in the reissued patent. As the specification clearly describes the composition of matter, and all the ingredients and proportions, in language perfectly intelligible to those skilled in the art, it would not be invalidated by the failure to deposit in the patent office a sample of one of the ingredients. This requirement, like some others, is made obligatory before the granting of the patent. It is for the commissioner to decide, before granting the letters-patent, whether it has been complied with. If he does so decide, and grants the letters-patent, that cannot be subsequently impeached by evidence tending to show a want of compliance with the law as to giving notice, or paying fees, or performing the other acts required to be done before the patent is granted, and the performance of which is to be proved to the satisfaction of the commissioner, whose decision on these questions is final where he has jurisdiction.

In considering the questions of novelty and infringement in this case, I shall consider them only with reference to their application to division B. In this aspect of the case it is not necessary to decide whether the views expressed in an opinion given by the learned judge of the district court of the Eastern district of New York, denying the motion for a preliminary injunction based upon an alleged infringement of division A, which opinion was based upon the evidence before him on ex parte affidavits, would justify similar conclusions upon such a state of the evidence as is exhibited upon the final hearing in this case. It is apparent that the testimony in this record, aided by the elaborate investigation and learned arguments of the counsel on both sides, has presented this question, so far as it relates to division A, in many new and different lights from those brought to bear upon it in the presentation of the question before that learned judge. But the infringement, if there were any in this case, was of the composition of matter described in division B. I shall confine my decision to that branch of the patent. Thus confining it, I do not think the invention described in that division had ever been anticipated, and I do think it describes a patentable invention. Division B is for an improved paint to prevent the fouling of ships' bottoms by the

adhesion of barnacles, sea-weeds, and other substances; a paint which can be applied with a brush like ordinary paint, and which is compounded, first, of a suitable vehicle or medium; second, of the oxide of copper yielding a poisonous solution in water; third, together with such earthy and mineral matters as separate the particles of the oxide and retard such solution. This composition, the patentees state, practically protects ships' bottoms as well as copper sheathing or yellow metals, and at much less cost.

Reliance is placed by the defendant principally upon the paint of Charles Wetterstedt, as anticipating this invention. Letters-patent were issued by the United States, Aug. 5, 1851, to Charles Keenan, assignee of Charles Wetterstedt, for a new and useful improvement in metallic alloy paints. This was a well-known paint in common use at the time complainants made their application, and was referred to and disclaimed by them in their specification, and consequently decided by the commissioner of patents as not interfering with their application. We have already seen that complainants' paint, division B, was a combination of oxide of copper, yielding a poisonous solution with a suitable vehicle or medium, and a base of earthy or mineral matter. Wetterstedt describes the basis of his invention "to consist in the combination of regulus of antimony in various proportions with copper, tin, zinc, or lead."

In enumerating the advantages of his antimonial paints, he states that antimony, as a constituent of metallic paints, possesses the property of hardness and power to resist mechanical abrasion from the friction of water, and that it imparts this property to its alloys, as in case of type-metal; also that the regulus and its alloys are more brittle than other simple metals and their compounds; and, lastly, he claims that the covering of copper, yellow metal, or iron ships' bottoms, with antimony, protects them, in consequence of the protective effects of its galvanic action. "The oxide of copper is influenced by the antimony in a manner similar to that of metallic copper, and hence, when used to form paint with antimony or its alloys, it is but slightly affected, in consequence of the protective influence of the antimony, but is allowed to dissolve just sufficiently to produce poisoning of animals, and adhering to the surface."

When his paint was to be used or iron surfaces, after painting the surfaces with two coats of a paint made with antimony and lead, he directs, in addition to those two coats of paint, another compound of two pounds of the alloy of antimony and copper with four pounds of oxide of copper mixed with five pints of the mixture of tar and naphtha, and three pints of pure naphtha. This latter paint of Wetterstedt differed from the composition described in division B, in the absence of the earthy or mineral basis,

which is intended in the composition of complainants to protect the oxide of copper by dissolving more slowly than that does, and also in the fact that, while the same or an equivalent vehicle is used in both, the Wetterstedt paint has in combination with that vehicle, in addition to the oxide of copper, an alloy of antimony and copper, the three elements operating together to produce the poisonous action; while in complainants' paint there is no equivalent for the alloy of antimony and copper in Wetterstedt's paint. This omission of one of the ingredients before supposed to be essential would be, under circumstances like these, a patentable subject. The mixture of antimony, copper, and the oxide of copper, to make the protective paint of Wetterstedt, involved, according to the description in his specification, a complicated and expensive process; and when the paint was made, it required the use of another and different paint as an auxiliary protective agent, when used as a marine paint. The marine paint described in division B is comparatively simple and inexpensive in preparation, and, according to the testimony in the case, at least equally effective in its application.

Ford's patent, which was for a process for purifying oil of turpentine and naphtha, and for dissolving therein India-rubber, gutta-percha, and like gums, and applying such solutions as a cement, varnish, paint, or waterproofing agent, contains a suggestion that such solutions may be combined with oxides or salts of copper to be employed as a coating for iron ships' bottoms. He does not seem to have been aware that the application of his paint to the bottoms of iron ships would be worse than useless, as proved by the evidence of the experts in this case. The other patents set up as anticipating the complainants' invention seem to have been introduced principally to show the state of the art, and do not require any more extended notice in connection with the question of novelty further than the simple statement that they furnish no defence on that ground. The evidence of infringement is clear. The vehicle used by defendant is substantially for this purpose the same as complainants'. He uses the same protective agent, the oxide of copper; and the Brandon red which he uses, being an oxide of iron associated with more or less of earthy matter, and which, by its imperfect solution in sea-water, retards the solution of the oxide of copper, is, in operation in the combination, the equivalent of the mineral or earthy base in complainants' composition.

Decree for injunction on division B, and for an account.

[For other cases involving this patent, see note to Tarr v. Webb, Case No. 13,757.]